The next case, case number 20-4126, Vitamins Online v. HeartWise. Counsel, please proceed. Thank you, Your Honor. To please the court, my name is Joseph Trojan. This is a case involving a 9.5 million dollar judgment in a false advertising case under the Lanham Act. The nature of the false advertising were misrepresentations concerning my client's products for Garcinia cambogia and green coffee extract or herbal remedies that provide benefits for weight loss and control cholesterol and triglycerides. There was also a claim that by voting up positive reviews on Amazon that constituted false advertising, which is a certainly a first as far as we know. We're not here today to talk about those particular claims or those issues. Those are probably not appealable issues. The appealable issues in this case, there are two reversible errors. The first is an erroneous legal standard that was applied to presumption of harm. The second was a rare legal error on appeal. It was an erroneous finding of fact in which documents to support the presumption of harm were misunderstood to be dated in 2014 when in fact they were in 2012. This was a surprising mistake by the district court because in summary judgment rulings previously, the court had understood the proper dates of those documents. Dating them in the wrong year is fatal to the entire judgment as will be explained. So what is the presumption of harm? A presumption of harm to a particular competitor can be presumed in two cases. One, if it's a comparative advertising case where you're actually making false statements in comparison to the specifically named competitor or whether it's only a two-player market. Those are the only two circumstances in which there can simply be a presumption. Otherwise, you need to prove harm. So tell me this. I mean, do you have a case that says it has to be a quote two-player market close quote? Well, we've, the district court believed that and also we decided to the district court's analysis was more based on there being a limited, a very limited number of players in the market outside of your client in Vitamins Online. Correct. Okay, so that's more than a two-player market. There are other market participants just that the lion's share of the market is taken by your client in Vitamins Online. The court's ruling was based upon there being a sparsely populated market and that's in that that's what the court found. Originally, it said there was in the summary judgment rulings that there was not a two-player market. It said in volume one at page of appendix volume one at 224 in the summary judgment ruling it specifically says quote because this case does not involve comparative advertising and because Vitamins Online and NatureWise are not in a two-player market, the court declines to apply a presumption of injury on the landmark claim in this case. So it, we went to trial based upon the presumption of injury not being a part of the case. At trial, the court concluded that there was it was a sparsely populated market but it based it upon erroneous documents. It wasn't the documents, the two key documents to me seem to be documents 5146 and 5147. Those seem to not relate to the entire years of 2012 and 13 but from 2012 till about September or so of 2013 but not for the last three or four months of 2013. So is there any evidence of it being still a two-player market for the fourth quarter of 2013? No, there's there's no evidence of that because everyone agrees that the market was exploding because of the Oz effect. So there was actually, there was actually. So the evidence, assuming legally that it's sufficient, the only legally sufficient evidence was for 2012 and through the first three quarters of 2013. There is no other evidence. There's, the court found that by 2014 the market was inundated. But it's not just saying 2014, we've got to look at the evidence. The evidence doesn't even go through the fourth quarter of 2013. My point is that even looking at it very narrowly, it seems to me there'd be a gap of evidence at least for for the fourth quarter of 2014. Right, but the damages were limited to the 2012 and 2013 time period. For the 2000, by the time that the green coffee was introduced in 2012, the trial exhibit 5146 is dated June 19, 2012 and it had 299 sellers at that time. By September of 2012 in exhibit 5147, there were 527 sellers. Neither, those numbers do not represent a sparsely populated market. Those are significant markets. What evidence or exhibits are you referring to here? That's what's in 5146 and 5147. Those documents are dated in June of 2012 and September of 2012 and even the court had concluded based upon those documents, that's the only basis for the judgment below, that believing that they were dated in 2014, the trial court said based upon 5146 and 5147, the market was inundated with competitors by 2014. So as far as 2012 and 2013 are concerned though, you're defining the market more broadly than the district court did. You're defining the market as the people who were selling green coffee products and I can't remember what the other one is. And the district court was defining those more specifically as a product that contained these certain levels of certain ingredients. Is that fair? The court made reference to the level of market. There was actually evidence that other people had 60% and that's throughout the record and there was no attempt by the plaintiff to actually show that that was in fact a sub market. And in our brief, we go through quite a detailed analysis of what constitutes a sub market. Isn't there evidence, sort of self-evident though, on that issue when the demand for this with these certain levels of certain ingredients was spurred by Dr. Oz? That would not explain the huge number of other sellers that did not have this particular trademark to make a product. Are you talking about the coffee in answering this answer or are you talking about the vitamin supplement or both? There's the green coffee and then there's the in answering Judge Carson's questions, are you referring to just the coffee market or the vitamin market as well? And are the two markets, in terms of competitors and all, do they roughly move in tandem? Right. Right what? They go and identify, the plaintiff identifies something special about both of its products. I know that, but in terms of whether there's more than a Are the facts on that, are they in parallel between the coffee and the vitamin supplement? Or do the two, I mean it seems to me those could be two very different markets. It might have very different composition of competitors. Correct. So how are you answering Judge Carson? Which market are you talking about? With respect to the green coffee supplement, they believe that they have this particular ingredient in it with the HCA that's 60%. And when you look at that at the particular market for that, you see other people claiming that same ingredient at 60%. For the coffee, right. And then for the Carcinia Cambogia, they claim another ingredient, but in that, there's no evidence that consumers, there was no attempt at all to have a survey as to what consumers were selecting. And in all of the reviews online, the thousands of reviews online, no one was talking about these particular ingredients as to why they were selecting particular products. So it's a complete... Well they were at some point because Dr. Oz kind of made it the buzzword at a certain point. He made the more general, he was talking about green coffee. Did Oz only talk about the coffee? He didn't talk about the vitamin supplement material? No, he talked about both, but he talked about them in general terms and also in specific terms. So he certainly made reference. My question, and a bit of my confusion, is it's not completely clear to me when you talk about these competitors that came in, there was two and then there was a lot, but not very many that were big. And I'm just not completely clear in my mind if you're differentiating between the coffee and the supplement or not. Well with respect to the second supplement, the Garcinia Camboja, that's exhibit 1058. That's, nature-wise, did not enter the market for that until approximately July of 2013. By that point, there were over a thousand competitors in that particular market. That's shown in Appendix Volume 7 at 1553. Now were those a thousand competitors with the levels that were talked about by Dr. Oz and basically copied by your client? The levels of the certain ingredient? I can't remember what the ingredient's name is. Right, so that's Vito. Right, yeah. I mean, I guess you say there were a thousand other competitors. Were they competitors who said they were selling Garcinia Camboja generically or that they were selling it with the specific ingredient that made it special for Vitamin Online, their product? That gets into whether their special product was actually a sub-market. There's no evidence whatsoever it was as qualified as a sub-market. We go into great detail in the brief about what's required under US Supreme Court law to be a sub-market. The judge never gave us a very good definition of what a market was. That's correct. And in fact, all of this data that's relied upon with respect to where someone's rates in Amazon is not a proxy for market share anyways. So you're looking at this, you have no idea whether, if you're going to talk about a sparsely populated market and expand a lot to include that, that would make sense to me if you were to go and look at the market and say, okay, we did a market share study and 98% of the market is dominated by these two players and there's 50 other players for the last 2%. That's still a sparsely populated market even though there's 52 players in it because two people are dominating it. We have no data about that. That was the plaintiff's obligation if they wanted the presumption of harm. They didn't have a presumption of harm and it's critical. The rules for a two-player market or comparative advertising are well-founded. The reasons, the policies behind them because you need to show, you're giving that presumption knowing that it is highly likely that that particular plaintiff is the perpetrator. The intervening factors are huge. They had a rating on Amazon of 2.9 stars. There were 17 other competitors with higher ratings. Competitor, people on Amazon. They had that rating throughout. I mean that rating didn't change. It was consistently low for years. They did nothing about that. Their prices, when the Oz Effect took effect and there was an inundation of the market and prices were going down because there were so many competitors, they refused to lower their prices. At times their prices were 50% higher. Of course they're losing sales. During these two years they were 50% higher? I thought there was only a couple of dollar difference. No, no. For example, in November 10, 2012, Vitamin Online Green Coffee was $28.95 per bottle while Naturewise's Green Coffee was $19.95 per bottle. That's at volume 6, 1371. It would fluctuate over different times but they were consistently at a higher price point. So naturally, lower rating, higher price point and the Oz Effect. The Oz Effect, what does it mean? Just those two factors are dominant economic factors. Pricing and rating. When you're on Amazon, people are looking at those more than anything and then they're saying that they're entitled to $9.5 million because they presume that all of those sales would have gone to them. That's just nonsense. With the Oz Effect, it's critical because when they start seeing a drop in their sales, it's because of the Oz Effect, so many competitors came into the market and everybody's taking from the people who already were there. Because all of a sudden there's so many different choices and then when there gets to a point where there's so many competitors, thousands of competitors in a particular market, and then you see people starting to drop their prices to compete in such a crowded market. They wouldn't drop their price because they believe their product was special. But what happened? They lost sales. Thank you, Counselor. You're out of time. Why don't you go ahead and I'll give you a go ahead and wrap up here, if you want to. No, there's no basis for $9.5 million. Okay, thank you. Judge Ubel, do you have anything to add? No. Okay, thank you, Counselor. Good morning, may it please the Court. Chad Neidiger on behalf of the Appley and Crosspellant Vitamins Online. The opposing counsel wants to make this case about a presumption, but I want to set the backdrop here for just a moment if you'll indulge me. The lower court found that Vitamins Online's Super Citra Maxx Garcinia product was clinically proven with 60% HCA that was bound to a calcium and potassium salt. That's at the appendix, page 996. Garcinia is not, sorry, generic Garcinia is not clinically proven and does not have the 60% HCA bound to potassium and calcium. That difference is what gave Vitamins Online a competitive advantage over all the other sellers of generic Garcinia because Vitamins Online was the only one selling that clinically proven product with that special formula. Dr. Oz recommended those specific characteristics, 60% HCA bound to calcium and potassium, on his show. That's what drove the demand for that product. And so we look at, we've talked about exhibits 541 and 546. 541, 5146 is in June 2012. Well, that was before NatureWise was even on the market at all. There were other sellers of generic Garcinia at the time, but Vitamins Online's sales were skyrocketing because those were sellers of generic Garcinia. And those exhibits, there's nothing in those exhibits, 5146 and 5147, showing competitors advertising 60% HCA, advertising the specific characteristics of the products that gave Vitamins Online its competitive advantage. The only other competitor who's advertising those specific qualities in its products for both Garcinia and for green coffee was NatureWise. The critical thing, though, is that NatureWise's advertisements were false. They were saying they had 60% HCA bound to calcium and potassium when they did not. They were saying that they had the special characteristics of chlorogenic acid in the green coffee and the specific Svetol and GCA brands, but they did not. And that's the critical difference. So where, though, did the district court define the market? Where did the district court say, this market is not generic Garcinia Cambrosia? It is Garcinia Cambrosia with these certain levels of this certain ingredient. And the same for the green coffee supplement. Where did the district court say that that was the market? The court doesn't come out and expressly state that, but if we look at what the court held overall, we can discern that that's what was going on. Because the court found, the court had an entire section in its findings, a section that's not rebutted on appeal, titled Impact on Vitamins Online, where the court goes through and talks about the injury that NatureWise's sales and advertising had specifically on Vitamins Online. That is injury. That's damage sufficient to meet 1125A and establish liability in this case, regardless of any presumption of what the market was or was not. So did you argue to the district court that you should benefit from a presumption? We do believe that we should benefit from a presumption. So that wasn't the question. So you either did or you didn't. Did you also argue to the district court in the alternative that you could prove actual harm? Yes, your honor, and that's that. So tell me how that came up. So if you look at the exhibit pages 1018 and 1019, here the district court makes specific findings about the impact. And like I said, this section in the court's findings is titled Impact on Vitamins Online. And there the court goes through and talks about that. Don't disagree that you don't have, that didn't present evidence that you were harmed. Question is, is for purposes of your legal argument to the district court, did you argue you don't even have to get to the presumption issue, judge, because we've presented you actual evidence of actual harm? Did you make, if we look in the transcript and and scrub your briefs below, are we going to find that argument? Well, I don't know if you'll find that argument in those words, but the fact is we have to look at, sorry, we look at the evidence that was presented below. And that's what's on review here on appeal. And the evidence presented below has ample evidence of actual harm to Vitamins Online. And the district court made actual findings. Those appendix pages at 1018 and 1019, those are the district courts. That's Judge Kimball's findings of fact, where he goes through and he talks about the types of harm that Vitamins Online suffered at the hand of NatureWise. Okay, so fair enough, but he makes his decision based on a presumption. And he presumes harm. He doesn't then wrap it all up in a nice, neat package for us. Well, the packaging wasn't ideal, I agree. But, so Judge Kimball, he applied a rebuttable presumption of harm, okay? Right away, he started off, that was my impression, that this presumption carried his analysis forward. In this case, you can't make any conclusions about what he would have done had the presumption not figured into his analysis. Well, if we look at what the analysis was and the presumption that was applied, it was a rebuttable presumption. And rebuttable presumption is not a conclusion. All it does is, it's a rule of evidence, it does a little bit of burden shifting. Well, it is, isn't it? If there's a rebuttable presumption that's not rebutted, then, I mean, presumably what happened here is, at least the way you read the district court's order, is that the district court says there's a rebuttable presumption, and at the end of the deal, at the end of the order, you win. So that means your opposing counsel didn't rebut it. Yes, but we have to look at why it wasn't rebutted, okay? So in determining whether or not that rebuttable presumption was rebutted, the district court, Judge Kimball, took into consideration all the evidence that was presented. It wasn't that he said, okay, you've met your burden of proof vitamins online, and now I'm only looking at the evidence that Naturewise put in, and that's it. No, Judge Kimball looked at all the evidence to see whether that presumption had been rebutted. So he lists out on pages 1018 and 1019, and that all factors in to whether the presumption was rebutted or not. And given the fact that there was actual harm that was incurred, as shown on those pages, no, of course the presumption was not rebutted. But at the end of the day, the presumption's also not necessary. And this is where, I think, Judge Kimball... The presumption has been rebutted, okay? Which he didn't say. Correct. But he then didn't say, but I find that even though they rebutted the presumption that your evidence is better and you win on the harm issue, then you still win, right? Yes, but he didn't say that. He never got to that. He never got to where, to the point where he said the evidence of harm that you presented won the case for you. He didn't say that because he didn't need to. Because he found that the presumption was not rebutted. But if we look at the standard, and this is where I think Judge Kimball did make an error, was the standard that he was requiring to open the doors for disgorgement. And that standard that Judge Kimball was applying was he was requiring Vitamins Online to basically establish a one-for-one loss of its sales compared to the sales of NatureWise. And that was the basis for why he denied liability from 2014 on. He said that from 2014 on, Vitamins Online has a sale by NatureWise was a lost sale for Vitamins Online. And so Judge Kimball basically found that for 2012 and 2013, Vitamins Online met that legally erroneously high burden of proof to show harm of one-to-one loss, which is not what's required to open the doors to disgorgement. All that's required to open the doors to disgorgement is harm, is some damage, some injury. And once that's established, the doors are open. And under 1117A, there's a burden shifting under the statute that then requires NatureWise to come in and prove, okay, this is when the damage stopped. This is the amount of sales that's not profits. These are the reasons other than our false advertising why we made these sales. And there's that burden shifting that happened. Well, Judge Kimball, in addition to holding Vitamins Online to this one-to-one loss requirement, which we met for two years, but not for 2014 on, he then also required Vitamins Online to continue to show harm after 2014, which eviscerates the burden shifting in 1117A. So once Vitamins Online met its initial burden for 2012... The burden shifting did not continue after 2013, I don't think. I don't think the evidence would support that. There was too many competitors by then. Well, okay, Judge Kimball, this gets to the question of what is a competitor. So they point to 5146 and 5147. Those are simply search results. If you actually look at those exhibits, those exhibits include results that are books, that are electronics, that are all sorts of things that are not really competitors. I mean, when a market explodes because Dr. Ross talks about it like what happened here, will people start to put those key words in their description of their product, even if it has nothing to do with it? For example, you could say, for example, vitamin D works well with green coffee. And so now your vitamin D is going to show up in the search results for green coffee, right? And that's why you see there are these thousands of search results. Those aren't really competitors. And if we start to talk about what's really an competitor, if we start to talk about the specific characteristics identified by Dr. Ross, the specific characteristics that Vitamins Online used for its market advantage and that NatureWise falsely advertised, you don't see any competitors. Those other competitors are simply generic sellers. And like I said, 5146 is in June 2012 before NatureWise was even on the market. Don't you have a proof problem ultimately after third quarter 2013 because the district court purported to rely on the wrong document? I mean, doesn't it, going forward, there's just no evidence? Or at least we don't know what the evidence was. We know that what the district court purported to base its wrong. No, I'm not sure evidence of what, Your Honor, what you're referring to. Well, I mean, your point seems to be, okay, once we meet the harm burden, it shifts and it's their job to show no harm. Well, I mean, once you get past third quarter 2013, the only document in the record that the district court appears to have relied on was one that it relied on erroneously. So doesn't that, I mean, at least right for as we stand here today, cut you off? No, well, Your Honor, first you're making one critical error. There's not a 2013 document. No, I know that. 5146 and 5147 are both 2012. Okay. Okay. So that's, I want to correct that because there seems to be a misunderstanding there. Okay, so I mean, but that doesn't change anything. But yes, but that's, so that's their evidence trying to show that the harm ceased, right? But we show that the harm happened in 2012 and 2030 at a one-to-one ratio. And then there's nothing, there was no change. They didn't change their conduct in 2014. They continued to advertise. They continued to rely and use the false Amazon reviews and the block voting and all that. All that continued in 2014. They've done nothing to show that anything changed in 2014 that would cease the harm. The sales figures bear this out. The sales figures, vitamins online is going up. NatureWise enters the market. Vitamins online sales are decimated. I mean, we've got to, we've got to use the evidence. I mean, for those later years, we've got to use the evidence the district court said it was relying on. Do you agree with that? Well, yes and no. When assessing the damage, yes. I understand your point, but I mean, we've got to do something with, I mean, you admit that the, at least the district court, at least misspoke as to the dates of documents. Yes, that's, we agree that that was an error. So we, so we at least have that to deal with in this overall analysis that the district court appeared to make an error there. The district court did make an error there, but that only hurts the appellant because of all the factual findings where he did not make an error on 1018 and 1019 regarding harm. Those continue to stand unrebutted and uncontested, and that harm alone is a matter of law under section 1125A. And so, consequently... Without the presumption, I'm not sure they are adequate. Because he, without that presumption, there is no evidence that, why, that Vitamins Online lost, lost sales in the market. Maybe it was because it was too expensive. Maybe it was because, yeah, that the buzz dropped off of it, of the product. I mean, there's, there's just no evidence of a causation. Without that presumption, it seems to me you are pretty much sunk. I respectfully disagree, Your Honor. And in our briefs at pages 46 to 49, we list out all the evidence showing both harm and causation. We have that, we have the decimation of sales. We provide an exhibit showing that consumers switched. We should, the expert witness said that no other factor was, could possibly explain, nature-wise, taking Vitamins Online's number one selling position. So you're saying your appellant brief on pages 36? No, 46 to 49. 46 to 49 summarizes your actual evidence of causation. It, well, that, that talks about the sales, but, but the actual evidence of, of causation and harm goes from 46 all the way through 60. And we, we walk through that evidence. And I see that I'm out of time. May I, may I wrap it up? Go ahead. Very briefly. Thank you. Well, this case is whether Vitamins Online was So, the appeal can be affirmed because the Utah unfair competition claim was a basis for, for the remedy given and was not appealed. And so therefore, we respectfully ask the court to affirm on the appeal and reverse and remand for a discouragement on 2014 plus on the cross appeal. Okay. Thank you, counsel. Let's give Mr. Trojan a couple of minutes since we went over. Thank you, Your Honor. With respect to the evidence, trial exhibit 1058 is also an evidence. It refers to over a thousand search results for the Garcinia Cambogia. And then with respect to the continuing evidence into 2013, by April 1 of 2013, there were 1,131 results for the green coffee. There were, it exploded to 22,082 results by June 1, 2013, and it went to 40,382 results by November 11th, 2013. This is found at Appendix Volume 6 at 1371 to 1375. And so, and we appealed all issues. The appeal, the notice of appeal is for the judgment, not for a particular cause of action. Did you address the Utah cause of action in your briefing? We, at the end of our briefing, addressed that in response saying, basically... Was that in your reply brief? Correct, in which we simply say the cause of the elements are the same. We're arguing for the reversal of the judgment. And so... So that was only in your reply brief that you addressed the Utah judgment? Well, we appealed in our opening... I know what you appealed, but you didn't address, argument, except in your reply brief. You're correct. We did not specifically argue the Utah law because it's, it was dealt with under, at the lower level, all as one cause of action because the elements are the same for it. And the notice of appeal is for both. Okay. Thank you, counsel. Okay, thank you both for your good arguments. The case will be submitted and counsel are excused.